**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

MOVEMENT MORTGAGE, LLC

　　　　　Plaintiff,

　　v.

DERAN PENNINGTON, CHRIS SHELTON,
MATT SCHOOLFIELD, LINDA PLYMALE,
HEATHER FRYE, JOSH COVETT and
SUMMIT FUNDING, INC.,

　　　　　　　　Defendants.

Civil Action No. 3:23-cv-00633

**THIRD VERIFIED AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
AND FOR DAMAGES AS TO CERTAIN DEFENDANTS**

Plaintiff Movement Mortgage, LLC, by and through its undersigned counsel, hereby files

this Third Verified Amended Complaint, seeking injunctive relief against all Defendants, monetary

damages against Deran Pennington and Summit Funding, Inc., and such other relief as the Court

deems appropriate, and in support thereof, avers as follows:

**The Parties**

1.　　　Plaintiff Movement Mortgage, LLC ("Movement") is a Delaware limited liability

corporation with a principal place of business at 8024 Calvin Hall Road, Fort Mill, SC 29707.

2.　　　Defendant Deran Pennington ("Defendant Pennington") is an individual who

currently resides at 133 Pinegrove Circle, Lake Wylie, SC 29710.

3.　　　Defendant Matt Schoolfield ("Defendant Schoolfield") is an individual who

currently resides at 16420 Segars Lane, Huntersville, NC 28078.

1

4.     Defendant Chris Shelton ("Defendant Shelton") is an individual who currently resides at 10905 Enchanted Hollow Way, Raleigh, NC 27614.

5.     Defendant Linda Plymale ("Defendant Plymale") is an individual who currently resides at 508 Old Dairy Drive, Wake Forest, NC 27587.

6.     Defendant Heather Frye ("Defendant Frye") is an individual who currently resides at 46 Scottsdale Drive, Fredericksburg, VA 22406.

7.     Defendant Josh Covett ("Defendant Covett") is an individual who currently resides at 555 Amberidge Terrace, Atlanta, GA 30328.

8.     Defendant Summit Funding, Inc. ("Summit") is a corporation organized under the laws of the State of California with a principal place of business at 2135 Butano Drive, Suite 150, Sacramento, CA 95825.

## Jurisdiction and Venue

9.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

10.     Moreover, though Defendants Schoolfield, Shelton, Frye, Covett and Plymale (the "Restricted Employees") are subject to arbitration agreements, those agreements allow for the institution of any legal action in this Court for the purpose of obtaining injunctive relief.  Under Section VIII of the relevant employment agreements, since this Complaint seeks only injunctive relief as to the Restricted Employees, this Court maintains subject matter jurisdiction over the claims against the Restricted Employees.  *See* Exhibits C – M at § 8.

2

11.     This Court has personal jurisdiction over Defendants Schoolfield, Shelton and Plymale because they are residents of North Carolina, through their employment with Movement and due to the tortious misconduct directed at Movement in North Carolina.

12.     Additionally, Defendants Schoolfield, Shelton, Frye, Covett, and Plymale consented to personal jurisdiction in this district and division for actions related to their employment that involve obtaining temporary injunctive relief. *Id.*

13.     This Court has personal jurisdiction over Defendant Pennington because of his intentional and substantial activity within the State of North Carolina, as set forth in N.C. Gen. Stat. § 1-75.4.  Specifically, Pennington resided in North Carolina until 2020 during his employment with Movement, and he engaged in solicitation efforts of multiple Movement employees located in North Carolina during those exchanges who worked and resided in North Carolina, all while Defendant Pennington remained employed at Movement.  He further actively conspired with North Carolina residents Shelton and Schoolfield to facilitate their breach of restricted covenants by acting as their mouthpiece and indirectly soliciting additional Movement employees in violation of their restrictive covenants with Movement.  Furthermore, he tortiously interfered with Movement Employees' employment agreements which are governed by North Carolina.  Defendant Pennington engaged in these actions with the intention of ultimately diverting North Carolina customers from Movement to his new company, Summit.

14.     The Court has personal jurisdiction over Summit because of its intentional and substantial activity within the State of North Carolina, as set forth in N.C. Gen. Stat. § 1-75.4. Specifically, Summit conducts business in North Carolina and is registered with the Secretary of State to conduct business in North Carolina.  Furthermore, Summit's tortious conduct caused injury expressly aimed at North Carolina and interfering with Movement Employees' employment

agreements which are governed by North Carolina., as Summit knew it would. Summit engaged in these actions with the intention of ultimately diverting North Carolina customers from Movement to Summit.

15. Summit has utilized the benefits of its tortious conduct in North Carolina as well as the trade secrets, and confidential and proprietary information it misappropriated from North Carolina to target numerous Movement employees in other parts of the country and improperly divert customers from Movement to Summit.

16. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this District and/or were otherwise directed to this District, and Defendants are subject to jurisdiction in this District.

17. In addition, venue is proper in this Court because Defendants Shelton, Schoolfield, Frye, Covett, and Plymale agreed to litigate actions involving temporary injunctive relief between them and Movement in a federal district court in Mecklenburg County, North Carolina.

**Factual Background**

18. Movement was founded in 2008 and operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products.

19. Movement pioneered a unique approach to home loans centered around helping homebuyers quickly and easily identify their ability to finance a home purchase and expeditiously obtain financing in order to close with speed and efficiency on home purchase transactions.

20. Movement's ultimate goal with its business plan was the creation of relationships through its employees enabling them to sustain longstanding relationships with consumers and avoid any need for Movement to buy customer leads or develop internet-based leads that are common for most other lenders in the industry. Movement's system establishes its employees as

4

agents and ambassadors generating repeat business for the company and natural referrals and brand recognition. Movement's employees are specifically used to promote its brand and maintain and expand its relationships that are critical to the Company's success. The Company's processes reinforce the relationships beyond typical industry norms and bind customers and referral sources to the Company through relationships with employees and promote the Company's reputation to individual borrowers and referral sources, such as real estate industry professionals. Indeed, the Company's tagline "Have I made you a raving fan today" reflects its culture that its processes and systems are specifically designed to ingratiate and promote its people to other real estate industry professionals and borrowers alike, meaning that its employees become a legitimate resource and asset in its value and success.

21. Movement is licensed in all 50 states. Movement currently employees over 4,500 employees across 775 locations in the United States.

22. Movement expends a significant amount of time and resources to develop its brand and to market itself to potential borrowers. It has taken Movement years to build up the reputation and client base that Movement uses to generate revenue.

**Defendants' Employment and Contractual Obligations**

23. Defendant Pennington began his employment at Movement on or about May 1, 2008, as a Loan Officer.

24. Defendant Pennington was the eighth employee to join Movement. Given the nature of Defendant Pennington's position and longevity with Movement, Movement entrusted Defendant Pennington with confidential and proprietary information regarding Movement's operations, strategies, and employees.

5

25.     As a material term and consideration for his employment with New American Mortgage, LLC[1], now Movement, and in exchange for fair salary compensation, Defendant Pennington executed a Loan Officer Compensation Agreement (the "Pennington 2008 Agreement").  *See* Loan Officer Compensation Agreement, attached hereto as Exhibit A.

26.     The Pennington 2008 Agreement expressly provided that during his employment and for a period of six (6) months following the termination of his employment with [Movement], Defendant Pennington would not solicit any [Movement] employee to leave their employment with [Movement].  *Id*. at pg. 7.

27.     On or about May 11, 2009, in exchange for increased compensation, Defendant Pennington executed a Loan Officer Compensation Agreement (the "Pennington 2009 Agreement").  *See*  Loan Officer Compensation agreement, attached hereto as Exhibit B.

28.     Similar to the Pennington 2008 Agreement, the Pennington 2009 Agreement expressly provided that during his employment and for a period of six (6) months following the termination of his employment with [Movement], he would not solicit any [Movement] employee to leave their employment with [Movement].  *Id*. at pg. 13

29.     The Pennington 2008 and 2009 Agreements further obligated Defendant Pennington to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such confidential information, even after the termination of Defendant Pennington's employment with Movement.  *See Id*. at pg. 5-6; Exh. A at  p. 5-6.

30.     Defendant Schoolfield began his employment with Movement on or about July 16, 2012 as a Loan Officer.   As a material term and consideration for his employment with Movement, and in exchange for fair salary compensation, Defendant Schoolfield executed a Confidentiality

---

[1] Movement was formerly known as New American Mortgage, LLC.

6

and Non-Solicitation Agreement (the "Schoolfield 2012 Agreement"). *See* Confidentiality and Non-Solicitation Agreement, attached hereto as Exhibit C.

31.     The Schoolfield 2012 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Defendant Schoolfield's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly:

- Solicit or recruit any [Movement] employee to leave the employ of [Movement]; *and/or*

- Identify to any third party any Movement employee as a potential candidate for employment.

*See Id.* at §2.

32.     On or about September 13, 2013, Defendant Schoolfield was promoted to Team Leader.  In connection with his promotion, Defendant Schoolfield executed a Team Leader Agreement that set forth certain restrictions concerning his employment with Movement in exchange for his increased authority and compensation (the "Schoolfield 2013 Agreement"). Defendant Schoolfield was compensated in accordance with Section III of the Schoolfield 2013 Agreement, as modified during the tenure of his employment with Movement. *See* September 13, 2013, Team Leader Agreement, attached hereto as Exhibit D.

33.     Similar to the Schoolfield 2012 Agreement, the Schoolfield 2013 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Defendant Schoolfield's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly:

7

- Solicit or recruit any [Movement] employee to leave the employ of [Movement]; *and/or*

- Identify to any third party any Movement employee as a potential candidate for employment.

*See Id.* at IV(G).

34. Defendant Schoolfield further agreed to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such information, even following the termination of his employment with Movement. *See Id.* at IV(A).

35. On or about March 8, 2018, Defendant Schoolfield executed a Team Leader Agreement with Movement in exchange for his increased authority and compensation (the "Schoolfield 2018 Agreement"). *See* March 8, 2018, Team Leader Agreement, attached hereto as Exhibit E.

36. Similar to the Schoolfield 2012 Agreement and Schoolfield 2013 Agreement, the Schoolfield 2018 Agreement also expressly provided that during his employment and for a period of twelve (12) months following the termination of Defendant Schoolfield's employment with Movement that he would not, for himself or on behalf of any person or entity, directly or indirectly:

- Solicit or recruit any [Movement] employee to leave the employ of [Movement]; *and/or*

- Identify to any third party any Movement employee as a potential candidate for employment.

*See Id.* at IV(G).

37. The Schoolfield 2018 Agreement further obligated Defendant Schoolfield to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose

8

such confidential information, even after the termination of Defendant Schoolfield's employment with Movement. *See Id.* at IV(A).

38. Given the nature of Defendant Schoolfield's position with Movement, and in reliance on Schoolfield's representations and contractually binding agreements with Movement, the Company entrusted Defendant Schoolfield with confidential information regarding Movement's operations, strategies, and employees.

39. Defendant Shelton began his employment with Movement on or about January 9, 2012, as a Loan Officer. As a material term and consideration for his employment with Movement, and in exchange for fair salary compensation, Defendant Shelton executed a Confidentiality and Non-Solicitation Agreement (the "Shelton 2012 Agreement"). *See* Confidentiality and Non-Solicitation Agreement, attached hereto as Exhibit F.

40. The Shelton 2012 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Defendant Schoolfield's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly:

- Solicit or recruit any [Movement] employee to leave the employ of [Movement]; *and/or*

- Identify to any third party any Movement employee as a potential candidate for employment.

*See Id.* at §2.

41. On or about September 4, 2013, Defendant Shelton was promoted to the position of Team Leader. In connection with the promotion, Defendant Shelton executed a Team Leader Agreement that set forth certain restrictions concerning his employment with Movement in

9

exchange for his increased authority and compensation. Defendant Shelton was compensated in accordance with Section III of his Team Leader Agreement, as modified during the tenure of his employment with Movement. *See* September 4, 2013, Team Leader Agreement, attached hereto as Exhibit G.

42. Defendant Shelton's Team Leader Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Defendant Shelton's employment with Movement that Defendant Shelton would not, for himself or on behalf of any person or entity, directly or indirectly, solicit any employee of Movement to leave the employ of Movement and work for a competitive business. *See Id.* at IV(G)(a).

43. Defendant Shelton's Team Leader Agreements further provided that he use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such confidential information, even after the termination of his employment with Movement. *See Id.* at IV(A); *See* Exh. F at IV(A)

44. Given the nature of Defendant Shelton's position with Movement, and in reliance on Shelton's representations and contractually binding agreements with Movement, the Company entrusted him with confidential information regarding Movement's operations, strategies, and employees.

45. Defendant Plymale began her employment with Movement on or about April 16, 2012, as a Licensed Loan Officer Assistant. While employed at Movement, Defendant Plymale served as an assistant to Defendant Shelton working under his direction, supervision, and control. As Shelton's assistant, Plymale had unprecedented access to Movement's trade secrets, and confidential and proprietary information concerning onboarding, recruiting, training, coaching and

Movement's overall business methods. Few employees at Movement had Shelton's level of access, which as a natural result gave Plymale unique and extensive access.

46.    As a material term and consideration for his employment with Movement, and in exchange for fair salary compensation, Defendant Plymale executed a Confidentiality and Non-Solicitation Agreement (the "Plymale 2012 Agreement").  *See* Confidentiality and Non-Solicitation Agreement, attached hereto as Exhibit H.

47.    The Plymale 2012 Agreement expressly provided that upon termination of Defendant Plymale's employment, she would not remove or alter, without Movement's express consent, Confidential Information, as described therein. *See Id*. at §1.

48.    In exchange for increased compensation, Defendant Plymale executed a Licensed Loan Officer Assistant Employment Agreement that set forth certain restrictions concerning her employment with Movement in exchange for increased compensation.  Defendant Plymale was compensated in accordance with Section III of the Licensed Loan Officer Assistant Employment Agreement, as modified during the tenure of her employment with Movement. *See* November 8, 2013, Licensed Loan Officer Assistant Employment Agreement, attached hereto as Exhibit I.

49.    Defendant Plymale's Agreement obligated Defendant Plymale to use Confidential Information, as defined therein, solely for Movement's benefit and not to disclose such confidential information, even after the termination of Defendant Plymale's employment with Movement. *See Id.* at IV(A).

50.    Defendant Frye began her employment with Movement on or about October 19, 2011 as a Loan Officer.  As a material term and consideration of her employment with Movement, and in exchange for fair salary compensation, Defendant Frye executed a Confidentiality and Non-

Solicitation Agreement (the "Frye 2011 Agreement"). *See* Confidentiality and Non-Solicitation Agreement, attached hereto as Exhibit J.

51.     The Frye 2011 Agreement expressly provided that during her employment and for a period of twelve (12) months following the termination of Defendant Frye's employment with Movement she would not, for herself or on behalf of any person or entity, directly or indirectly:

- Solicit or recruit any [Movement] employee to leave the employ of [Movement]; *and/or*

- Identify to any third party any Movement employee as a potential candidate for employment.

*See Id.* at §2.

52.     On or about October 9, 2013, Defendant Frye was promoted to Team Leader. As a Team Leader, Defendant Frye was a Market Leader responsible for overseeing, recruiting, and maintaining the Company's team of loan originators located in Virginia. In connection with her promotion, Defendant Frye executed a Team Leader Agreement that set forth certain restrictions concerning her employment with Movement in exchange for fair salary compensation. Defendant Frye was compensated in accordance with Section III of the Agreement, as modified during the course of her employment. *See* October 9, 2013, Team Leader Agreement, attached hereto as Exhibit K.

53.     Defendant Frye's Team Leader Agreement expressly provided that during her employment and for a period of twelve (12) months following the termination of her employment with Movement that she would not, for herself or on behalf of any person or entity, directly or indirectly, solicit any employee of Movement to leave the employ of Movement and work for a competitive business. *See Id.* at IV(G)(a).

12

54.     Defendant Frye's Agreement further provided that she use Confidential Information, as defined therein, solely for Movement's benefit and refrain from disclosing such confidential information, even after the termination of her employment with Movement. *See Id.* at IV(A).

55.     Defendant Covett began his employment with Movement on or about June 9, 2014, as a Loan Officer. As a material term and consideration of his employment with Movement, in exchange for fair salary compensation, Defendant Covett executed a Loan Officer Employment Agreement (the "Covett 2014 Agreement"). *See* Loan Officer Agreement, attached hereto as Exhibit L.

56.     The Covett 2014 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Defendant Covett's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly:

- Solicit or recruit any [Movement] employee to leave the employ of [Movement]; *and/or*

- Identify to any third party any Movement employee as a potential candidate for employment.

*See Id.* at §IV.

57.     On or about May 18, 2016, Defendant Covett was promoted to Team Leader. As a Team Leader, Defendant Covett was a Market Leader responsible for overseeing recruiting and maintaining the Company's team of loan officers employed in Atlanta, Georgia. Over the past two years Defendant Covett's team has been responsible for hundreds of millions of dollars in loan volume for Movement.

13

58.     In connection with his promotion, Defendant Covett executed a Team Leader Agreement that set forth certain restrictions concerning his employment with Movement in exchange for increased compensation.  Defendant Covett was compensated in accordance with Section III of the Agreement, as modified during the course of his employment.  *See* May 18, 2016, Team Leader Agreement, attached hereto as Exhibit M.

59.     Defendant Covett's Team Leader Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of his employment with Movement that he would not, for himself or on behalf of any person or entity, directly or indirectly, solicit any employee of Movement to leave the employ of Movement and work for a competitive business.  *See Id.* at IV(G)(a).

60.     Defendant Covett's Agreement further provided that he use Confidential Information, as defined therein, solely for Movement's benefit and refrain from disclosing such confidential information, even after the termination of his employment with Movement.  *See Id.* at IV(A).

**Breach of Fiduciary Duty**

61.     Upon information and belief in or about March 2023, Defendant Pennington began engaging in conversations with Summit regarding employment with Summit.

62.     Specifically, in March 2023, while still employed with Movement, Defendant Pennington executed a Confidentiality Agreement with Summit (the "Summit Confidentiality Agreement).  *See* March 2023 Confidentiality Agreement, attached hereto as Exhibit N.

63.     Following the execution of the Summit Confidentiality Agreement, Defendant Pennington continued to work for Movement for approximately four months.

14

64.     During these four months he continued to receive compensation from Movement and was entrusted with Movement's trade secrets and confidential and proprietary business information.  However, during this period Pennington began to surreptitiously solicit and recruit both Shelton and Schoolfield to leave Movement and to assist him in recruiting other Movement employees to join Summit.

65.     While still employed at Movement, Defendant Pennington began using confidential information acquired through his position to begin his solicitation of Movement employees to Summit.

66.     After successfully soliciting Defendants Schoolfield and Shelton to leave Movement, but while all were still employed at Movement, Defendant Pennington began conspiring with Defendants Schoolfield and Shelton to solicit additional employees from Movement.

67.     Prior to his departure from Movement, Defendant Schoolfield managed a team of Regional Leaders comprised of Jonathan Garrick, Jonathan Niehart, Bart Evans, David Massey, and Jason Bobby (collectively the "Regional Leaders").

68.     On a call with the Regional Leaders, Defendant Schoolfield instructed the Regional Leaders to communicate with their staff that, as a cost cutting measure, Movement intended to cut loan officer compensation by 50-60% effective August 1, 2023.  Defendant Schoolfield also told the Regional Leaders that Movement was planning to cut Market Leader compensation, which Defendant Schoolfield knew would facilitate the eventual solicitation of Movement's Market Leaders.

69.     Importantly, Movement had not made the decision to implement any reduction of loan officer or Market Leader compensation or otherwise instructed Defendant Schoolfield to relay

such messaging to the Regional Leaders. Schoolfield made these false representations as a means to foment dissatisfaction at Movement so as to facilitate his plans to eventually solicit loan officers to leave Movement and join Summit. In reality, however, no actual decision to reduce compensation was ever made. While Movement at one point discussed that as one of multiple possible options for addressing the declining real estate market, all participants in those conversations were explicitly advised to maintain the confidentiality of the discussions given the potential impact on morale and the preliminary nature of the discussions.

70. Upon information and belief, Defendant Schoolfield understood that relaying messaging to loan officers that their compensation would be cut by 50-60% would create uncertainty about Movement and cause loan officers to consider resigning from Movement, such that Defendants could implement their plan to solicit Movement employees.

71. On or about July 1, 2023, Defendants Pennington, Schoolfield, and Shelton all resigned from Movement. Plymale resigned two days later.

72. Prior to leaving Movement, Defendant Pennington – whose primary responsibility for years was to grow Movement's production staff – expressed to John Third, Chief Innovation Officer, that if he ever left Movement, he would "gut it."

73. Upon information and belief, Defendant Summit paid a signing bonus to Defendant Pennington in an amount believed to be upwards of two million dollars and signing bonuses to Defendants Shelton and Schoolfield of as much as one million dollars. Given that Pennington, Schoolfield, and Shelton do not produce loans or otherwise generate revenue themselves, the only reason for these payments was to incentivize Defendants' improper activities as described herein.

**Defendants' Data Theft and Concealment**

74. On July 10, 2023, counsel for Movement sent correspondence to Summit advising

16

Summit of Defendant Pennington's illegal solicitation of Defendants Shelton and Schoolfield, its awareness of Defendant Pennington's intention to "gut" Movement, and that Movement received reports that Defendant Pennington conspired to use Movement's trade secrets and confidential and proprietary information to solicit hundreds of employees from Movement. *See* July 10, 2023, correspondence from Ari Karen to Scott Bruggermann, attached hereto as Exhibit O.

75. Summit wholly denied that Pennington, or any of its other employees, had done anything wrong and, in fact, sought to intimidate Movement from taking action against its employees, threatening Movement with legal action if it initiated claims on what Summit's general counsel asserted were baseless accusations. *See* July 13, 2023, correspondence from Scott Bruggermann to Ari Karen, attached hereto as Exhibit P.

76. Yet, at the very moment that Summit's General Counsel was issuing legal threats, Defendant Plymale – unbeknownst to Movement – was accessing proprietary and confidential documents at Summit that had been stolen from Movement.

77. Indeed, Plymale provided her notice of resignation on July 3, 2023, the Monday following Defendant Shelton's resignation. Movement agreed to allow Defendant Plymale's resignation to become effective July 7, 2023.

78. Movement, through a forensic inspection of Plymale's laptop that is still ongoing, has learned that in the weeks leading up to and following her resignation, she began systematically accessing and copying Movement's confidential and proprietary information and trade secrets.

79. Movement maintains critical and highly confidential data pertaining to the performance of its loan officers on a system called DOMO, which tracks every aspect of a loan officer's performance relating to volume, loan products sold, pull through rate, loan performance, and a host of other data critical to ascertaining the profitability and risk profile of the loans closed

by its loan officers. This information is particularly valuable because it would allow a competitor to ascertain with certainty (i) whether the type of loans closed by a loan officer meet its specific product matrix (ii) whether the loans are the type that the competitor wants to close; and (iii) by understanding up-to-date performance, identify the exact amount of compensation that can be offered to the loan officer without compromising corporate profitability.

80.     In the weeks leading up to her resignation – and while Defendants Pennington, Shelton, and Schoolfield were breeding dissent among Movement's loan officers – Plymale began an unprecedent use of DOMO. For example, in the four-month period from January through April of 2023, Plymale accessed DOMO only five (5) times. In May and June of 2023, Plymale accessed the system a total of fourteen (14) times. There was no valid business reason for the change in her usage of the system in terms of the work she was supposed to be performing for Movement.

81.     Further, when accessing DOMO, Plymale downloaded a number of specific reports that she rarely examined and a combination of reports that she had never previously accessed, demonstrating an intent to evaluate loan officer performance from a variety of perspectives. Within ten days of her resignation, Plymale downloaded and exported reports from DOMO including but not limited to LO Pipeline Reports and reports entitled "Loan Officer File Quality," "Loan Pull," LO Summary," and "Funded By Subsidy." These reports provide critical information about the profitability and performance of the loans closed by each loan officer, loan officer's current and historical volume, the interest rates charged to each loan officer's clients, the product types sold by each loan officer, the amount of exceptions to loan pricing and subsidies the loan officer provides, the types of customers they routinely service and a host of details that would allow someone unprecedented analysis of each loan officer's performance, profitability, and how that performance might translate to another company, market, and product mix available from

18

another lender.  In essence, the information allowed Defendants not only to target Movement's best loan officers, but to identify and match characteristics that would uniquely fit Summit's business now and in the future.

82.     Additionally, the information contains detailed customer information including but not limited to customer contact information, credit score, income and a variety of personal financial data and non-Public Information that was entrusted to Movement by consumers, which the Gramm Leach Bliley Act prohibits from dissemination without customer consent due to its highly personal and sensitive nature.

83.     Movement has learned that on July 3, 2023 – the date of her resignation – Plymale installed Dropbox on her computer and, upon information and belief, created a Google Drive (collectively "Cloud Servers").  Simultaneously therewith, she began accessing dozens of Movement documents concerning Movement's proprietary information and trade secrets on the details of how it recruits, onboards, and trains loan officers as well as the functions of various positions and overall business methods.  These documents include details developed with the investment of hundreds of employee hours, through consultations with experts and legal counsel, and with the benefit of years of trial and error.  They reflect Movement's unique business methods which allow loan officers to identify the best products for customers and the loans a borrower is most likely to qualify for, allowing the identification of potential approval obstacles up front so that borrowers can make more informed decisions earlier in the loan process and can be provided more accurate information at the outset of a loan application.

84.     Additionally, these documents include training manuals, reference manuals; coaching manuals, unique proprietary relationships with investors and vendors; checklists; calculators; internal timelines; internal deadlines; job specific resource guides; templates;

communication protocols; internal workflows; and streamlining and efficiency standards and protocols for a variety of critical positions in loan underwriting, processing and closing that effectuate Movement's proven business methods.[2]  No one person would know all of this information.  Indeed, the details and tools relevant to even a single position are so comprehensive that people within that specific job function would be unable to recall and utilize the extensive tools and methodologies without accessing these materials.  Not only did Plymale access and copy these materials for a specific Movement position – she copied them with respect to nearly every critical function at Movement.  Moreover, she copied documents reflecting how each of these tools and methods related to one another and effectuated Movement's overall business strategy at a macro and micro level.  By way of analogy, Defendants did not merely copy a recipe in the cookbook, they copied the cookbook, the details of every food supplier, the details of every piece of equipment in the kitchen as well as the resume, reviews, and experience of every single cook and every dish the cooks ever prepared.

85.    Moreover, the access duration shows that these documents were typically accessed for less than a minute, meaning that Plymale was not reading the documents.  Rather, the duration of access is consistent with the documents being selected for copying and the duration of time it takes for an upload of the documents to Cloud Servers.

86.    Further, Plymale did not return her laptop on July 7th, the effective date of her resignation as required.  On July 10th and 11th – after she commenced employment with Summit –

---

[2] Just a few of these materials include by way of example, Movement documents entitled: The Process; Reference and Training Guide for Greenville Market LOs and LOAs; LOA Process: New Hire Reference Book; New Hire Welcome Reference Book; A to Z file Flow; How to Complete the Submission Checklist Guide; How to deliver a VIP Onboarding Experience; Guideline for Pipeline Managers.

she accessed approximately one hundred of these critical infrastructural Movement documents. Many of these were contained in the Cloud Servers that Plymale set up the day that she resigned. While Movement has a snapshot of the activity, given it does not have access to the Cloud Servers themselves, upon information and belief, there is substantially more data which Defendants misappropriated and accessed.

87.     Moreover, Movement has learned that on July 8th or 9th of 2023, Plymale met with Shelton and together they traveled to Summit's headquarters.  Thus, at the time she was accessing and likely sharing Movement's proprietary information and trade secrets with Summit, she was likely doing it from Summit's corporate offices.

88.     The nature of the documents accessed and likely copied by Plymale included virtually every document needed to replicate Movement's business plan both on a macro and job specific micro level.  Additionally, crucial details about loan officer performance and profitability and Movement's unique methods of recruiting, onboarding, and training were accessed and likely copied.  There were literally hundreds of internal Movement documents accessed and likely copied by Plymale *after* Plymale resigned.

89.     The documents accessed by Plymale detail Movement's onboarding, training, and continuing internal education for staff and how Movement frontloads the evaluation and processing of applications, along with the Company's proprietary system of overlapping and integrating different aspects of the loan application and approval process.  This allows Movement to approve loans expeditiously, identify potential problems up front, and avoid "last minute surprises" in the mortgage process that often place borrowers in no-win or stressful situations when fewer alternatives are available.

90.     Movement invests considerable time, attention, and resources to the development of its onboarding and training, and to the actual staff responsible for Company onboarding and training in its processes, as well as understanding those employees' role in connection with the Company's core mission and values.  Movement's success is predicated on teaching these unique processes and interactions to employees who often have no experience or vastly different experience in the industry.  This investment in training Movement's staff is substantial, continuous, and ongoing.

91.     While Movement has a snapshot of Defendants' activity, given it does not have access to the Cloud Servers themselves, upon information and belief, there is substantially more data which Defendants misappropriated and accessed.  Before returning her Movement laptop, Plymale deleted all of the files she accessed and/or downloaded at the time of creating the Cloud Servers and the files she accessed after joining Summit, likely while present at Summit's corporate offices.

92.     Upon information and belief Plymale was at all times working at the direction of and pursuant to the instructions of Defendants Shelton, Pennington, Schoolfield, and Summit for the purpose of providing information that would facilitate the recruiting of Movement's loan originators and other staff.  The information accessed is consistent with an intention to replicate the business methods Movement developed and relied upon that have propelled it to be one of the largest and most successful independent mortgage lenders in the country.  Summit would never be able to develop or replicate Movement's procedures, policies, and supporting documentation without improperly accessing and stealing this voluminous and detailed information developed and refined by Movement over years of consideration and trial and error. Accordingly, as a predicate to Pennington's intentions of "gutting" Movement, Defendants intentionally stole

22

Movement business methods and practices in an effort to create a replica necessary for the successful solicitation of Movement's loan originators and management staff.

93.     Furthermore, while still employed at Movement, Defendant Pennington sent to Summit, at the request of Summit's President Todd Scrima, Movement's Profit & Loss ("P&L") statement.

94.     Movement's P&L contained detailed confidential information concerning the salaries, commission, overtime hours, 401k, payroll taxes, and profitability of every Movement employee.  Such information is invaluable in identifying, targeting, recruiting, and soliciting Movement employees and is information that was not readily ascertainable through independent development or reverse engineering.

95.     Movement's P&L also contained nonpublic, proprietary information concerning 9,000 Movement borrowers, including margins on the loans.

96.     Additionally, and as set forth below, certain Defendants have used this information to understand which employees to pursue based on their performance and the types of loans they closed to find the best fits for Summit, as well as reviewing their compensation information to gauge how much to offer in compensation to solicit them to resign from Movement to join Summit. These activities included the targeting of loan officers who predominantly closed VA loans, which have been less affected by the current market circumstances.  This information could only be obtained using the data Defendants misappropriated.

97.     Indeed, prior to Defendant Pennington's decision to join Summit, Movement is unaware of any loan officers or managers having left the Company to join Summit or any effort by Summit to recruit Movement employees.  Since the resignation of Defendants Pennington, Shelton, and Schoolfield, approximately 30 loan officers and market leaders have resigned to join

Summit and Summit has solicited dozens more Movement employees using the trade secrets and confidential and proprietary information stolen by Defendant Plymale.

98.     Although Summit has been involved in this activity since June of 2023, Movement only recently uncovered the theft of information as a result of Summit's conscious efforts to conceal its unlawful and illegal activities.  Indeed, as a result of the delays in obtaining the return of Movement laptops and given the time to forensically restore deleted files, Movement only recently discovered the theft of its trade secrets and confidential and proprietary information which was occurring at the very time that Summit's General Counsel was proclaiming that neither Summit nor any of the Defendants had engaged in any wrongdoing.

99.     Summit's threats, denials and affirmative misrepresentations by its General Counsel relating to its present and ongoing activities were, upon information and belief, designed specifically to facilitate the theft and use of Movement's trade secrets in violation of 18 U.S.C. §1836. Given that the statute provides for criminal penalties extending to ten (10) years of imprisonment, the crime fraud exception may apply to any and all relevant communications involving Summit's General Counsel and require the amendment of pleadings to join additional defendants following the initiation of discovery.

**Defendants' Successful and Improper Solicitations of Movement Staff**

100.    While certain Defendants were stealing Movement's information, they were similarly attempting to create untraceable means to solicit Movement Employees.  For instance, Defendants began communicating with Movement employees via WhatsApp and using settings that would cause their messages to be deleted automatically within 24 hours.  Prior to leaving Movement, Defendants did not communicate with any Movement employees via WhatsApp.

24

101.    Defendant Schoolfield also began friending Movement's production staff on social media following his resignation despite the fact that he was not active on social media with Movement employees prior to his resignation.

102.    On multiple occasions Defendants Shelton and Schoolfield told multiple Movement employees that while they could not solicit them to move to Summit with them due to contractual restrictions, those restrictions did not apply to Pennington.  Thereafter, Defendant Pennington began soliciting these employees to join Summit.

103.    Although Defendants' assertions regarding the extent of their restrictive covenants were not accurate, their statements reflect the intent of their conspiracy -- the attempt to circumvent their obligations and solicit Movement personnel in an effort to "gut" the Company by conspiring with Summit and Pennington.

104.    Defendants Pennington, Schoolfield and Shelton, with the knowledge of Summit, successfully solicited Defendant Covett to resign from Movement and join Summit on or about September 1, 2023.

105.    Following Defendant Covett's resignation, he breached his employment obligations to Movement and began recruiting Movement employees that he supervised.  Indeed, immediately following his resignation, Defendant Covett, in concert with Defendants Pennington, Schoolfield, Shelton and Summit, solicited multiple loan officers and Movement staff to join Summit that he directly supervised as reflected by Exhibit Q to this Third Amended Verified Complaint.

106.    On or about September 22, 2023, Defendants Pennington, Schoolfield, and Shelton, with the knowledge of Summit, impermissibly solicited Defendant Frye to terminate her employment and join Summit.

107.    Immediately following her resignation, Defendants Pennington, Schoolfield, Shelton, and Summit then worked with Defendant Frye to breach her employment obligations to Movement and solicit her entire team of loan officers to leave Movement to join Summit.

108.    On or about September 22, 2023, Summit sent offers of employment to every loan officer in Defendant Frye's market, including Jessica Peyton, Dena Cooke, and Allison Mueller. Much like Defendants' erroneous belief that they could solicit indirectly through Pennington, Summit began directly soliciting Frye's team of loan officers immediately following her departure.

109.    Defendants' solicitations of Jessica Peyton and Dena Cook, as well as Allison Mueller were successful with them leaving Movement to join Summit almost immediately upon receiving the offers, indicating that the solicitations likely started prior to Defendant Frye's resignation.

110.    Defendant Frye has also begun to solicit other Movement employees, beyond those she supervised, repeating the falsehoods initiated by Defendants Shelton and Schoolfield that Movement is planning to cut employees' compensation.

111.    Soon after Defendant Frye's resignation, Defendant Frye, acting in concert with Defendants Pennington, Schoolfield, Shelton, Frye and Summit, solicited multiple loan officers and Movement staff to join Summit as reflected by Exhibit Q to this Third Amended Verified Complaint.

112.    Notwithstanding the fact that Summit was put on notice to cease and desist from illegal and unlawful activities, Summit used Movement's stolen trade secrets and confidential and proprietary information to successfully solicit multiple Movement employees in violation of the restrictive covenants Movement had in place with the Restricted Employees. Further, in violation of these agreements, and using Movement's trade secrets and confidential and proprietary

26

information, Summit has extended offers to several of Movement's employees associated with the employees that Summit has already successfully poached and continues to solicit countless others. Notwithstanding Summit's General Counsel's threats and denials, Summit has encouraged the breach of fiduciary duties owed to Movement by Defendants Pennington, Shelton, and Schoolfield, as well as stolen Movement's trade secrets and confidential and proprietary information. Moreover, they have actively conspired, encouraged, and facilitated the breach of contractual obligations the Restricted Employees owed to Movement.

113. Moreover, certain of the Defendants have attempted to conceal evidence of their solicitations and theft of data. In addition to the fact that Shelton, Schoolfield, and Plymale delayed returning their Movement computers following their terminations, Defendant Shelton and Schoolfield began communicating with Movement loan officers via WhatsApp after joining Summit. Schoolfield and Shelton had not previously used WhatsApp as a means of communication with their loan officers but began using it once they joined Summit. Upon information and belief, their choice to use WhatsApp was based upon the fact that WhatsApp can be set to immediately delete messages, which cannot be stored. Use of this means of communication – even after Movement had instructed Summit, Pennington, Schoolfield, and Shelton to initiate a litigation hold – was intended to conceal the improper and illegal actions complained of herein.

114. Movement recently became aware that during this litigation and even following the entry of an Order enjoining Defendants' unlawful conduct, Summit and its agents have expanded with the continued solicitation of more Movement staff using improper means. Summit's President Todd Scrima was personally involved in soliciting Movement employees in its Texas

region, with the assistance and knowledge of high-level Area Managers who – while remaining employed by Movement – actually facilitated Mr. Scrima's solicitation of Movement staff.

115.    In October, at least Defendants Schoolfield and Shelton, along with high-level Summit employees, traveled to Houston to meet with Area Manager Bart Evans, responsible for the region including Texas.  Following this meeting, Mr. Evans began spreading false information to subordinate employees he supervised about potential job cuts and compensation reductions at Movement.  Further, in the weeks leading up to Mr. Evans's resignation to officially join Summit, he visited multiple branches alongside a Market leader, Chris McCabe.  Employees that met with McCabe and Evans began inquiring about supposed job cuts and pay reductions that had never been approved by Movement management or even discussed at a company-wide level.

116.    Three loan officers who reported to Mr. Evans resigned even prior to his announced departure for Summit.  One of those former employees, Sandie Sanchez, confirmed she met with Summit President Todd Scrima while still employed at Movement during which time Bart Evans remained her supervisor.

117.    On November 3, 2023, Evans resigned.  Days later Chris McCabe—who reported to Evans – also resigned along with multiple loan officers that reported to him.  The nearly immediate and at times simultaneous resignation of staff reflects their solicitation by managers entrusted to supervise them while those managers were working for Movement.  Further, the evidence of meetings preceding their resignations and the inquiries prompted by false reports designed to undermine morale, along with Mr. Scrima's personal involvement in the pre-termination solicitations of staff, demonstrate the intentional and unlawful nature of certain Defendants' activities notwithstanding even the Order of this Court.

118.    Movement is aware that almost immediately after Mr. Evans resigned, Summit made offers to 20-25 Movement employees from Mr. Evans's region, which required prior planning and coordination while Mr. Evans was employed at Movement.   Moreover, the individuals targeted reflect significant insight into their current loan volume and the products they sold, which could not be available without Defendants' coordinated scheme to misappropriate trade secrets and confidential and proprietary information.

119.    Defendants' coordinated and illicit actions have enabled Summit to hire away numerous employees from Movement with many additional offers outstanding.  *See* Exhibit Q. There are no signs that Defendants will discontinue this corporate raid despite the stipulated preliminary injunction previously agreed to by Defendants in this case.  The number of Movement employees who have been solicited and joined Summit now stands at approximately fifty.

120.    Worse, Defendants' solicitation of Movement employees follows a common plan or scheme of working with high-level Movement employees, obtaining confidential information about the staff they supervise, and then using them – while they still remain employed at Movement – to "poison the well" by creating false narratives and introducing those employees to Summit.  Upon leaving, Summit then continues the solicitation process compounding the damage created by the breaches of fiduciary duty and the violations of contractual restrictions commenced while those high-level employees remained employed by Movement supervising the would-be targets for Summit's solicitation.

121.    Summit has used this strategy to great effect in conjunction with the Individual Defendants, first using Pennington to solicit Shelton and Schoolfield while they were still employed at Movement, who subsequently solicited other employees before resigning.  Once Summit successfully secured the commitment of regional managers, such as Covett and Frye, they

used them to target and solicit their team members before they ultimately resigned, priming them for offers. The success of this plan has only emboldened Summit despite the Court's Order as they repeated it in another jurisdiction through Evans and McCabe.

122. Defendants have blatantly advertised the success of Defendants' improper solicitations through social media as they essentially thumb their nose at the legal system's ability to hold them to account for their elicit activities. *See* Social Media Posts attached as Exhibit R. In fact, they have turned the legal process on its head by using these posts to downplay the perceived effectiveness of litigation among their targets and promote to other solicited employees that new hires continue to move without any apparent ability to stop them. They are clearly trying to send a message that Movement employees should continue to respond to these impermissible solicitations and inducements for misconduct without any need to fear repercussions regardless of their contractual terms.

**Summit's Solicitation and Misrepresentations To Movement Customers**

123. Summit engaged in a coordinated scheme to solicit large portions of Movement's business, first by targeting key employees and obtaining access to trade secrets and confidential and proprietary information, then by using that material to pursue additional high-earning employees of Movement's, some of whom were used to mislead and divert customers from closing loans at Movement to unwittingly do so at Summit.

124. Summit began working with current Movement loan officers who were intending to resign and join Summit to divert loans to Summit even though these loan officers remained employed at and licensed with Movement.

125. The resigning loan officers ("Resigning LOs") held themselves out to the public as agents of and licensed with Movement and customers believed they were dealing with licensed

30

loan originators of Movement. Indeed, in communications sent to customers and on the Nationwide Mortgage Licensing System, the Resigning LOs represented to the public that they were acting on behalf of Movement Mortgage. The Secure and Fair Enforcement of Mortgage Licensing Act (1) provides that each loan originator must conspicuously disclose the licensed entity for whom they work and (2) that a loan officer may not simultaneously work for two different licensed entities simultaneously. The purpose of these laws is to prevent borrower confusion and improve transparency to ensure that a borrower knows exactly which entity is responsible for arranging or providing the financing for their home as well as the identity of the entity being supplied their private nonpublic information. This transparency is critical so borrowers can hold the appropriate persons accountable in the event of any improper or unlawful activities.

126. Unbeknownst to Movement's customers, the Resigning LOs were originating, processing, underwriting, approving, pricing, and funding consumer loans with the intention of diverting them – and in fact, did divert them – to Summit, a Movement competitor.

127. Customers provided information to the Resigning LOs with the intent and belief that such information would be maintained in confidence with Movement to originate loans with and through Movement. In fact, unbeknownst to customers, Resigning LOs began diverting that information, without the consumer's knowledge or consent, to a wholly separate company, Summit, in violation of numerous federal financial laws. Summit even established a supposed Portfolio Retention Department and assigned a specific employee – John Felix – to receive such information from the resigning Movement loan officers.

128. Summit's actions and that of their agents constituted a blatant violation of the Gramm Leach Bliley Act, which prohibits dissemination of this data without customer consent due to its highly personal and sensitive nature. Additionally, their systemic actions caused

consumer confusion by representing an affiliation between Summit and Movement that obviously did not exist.  At other times, Borrowers were simply misled as to what was in their best interests to facilitate the diversion of loans, without regard to potential rate changes, the effects of multiple credit checks, or how this might jeopardize Borrowers' ability to ultimately secure the loan they were prepared to finalize with Movement.

129.     For example, on October 2, 2023, Movement Senior Loan Officer Tyler Henry, who would later resign to join Summit outright, sent an email to a consumer who was prepared to close his loan with Movement that he "recommend holding off on locking, however we can go ahead and get you applied with our sister company and if rates drop, we'll lock you in there. The only issue with this plan is transferring the appraisal. John Felix, with Summit Funding, will be reaching out shortly with the ling to apply." *See* Henry Email attached as Exhibit S.  Mr. Henry then forwarded the email chain and all information submitted by the consumer to qualify for their loan to John Felix at Summit.

130.     Summit created a formal position for Mr. Felix entitled Portfolio Retention Loan Officer to obscure what they were really perpetrating – a designed and intentional scheme to divert personal financial data of borrowers to Summit and create consumer confusion to unwittingly redirect borrowers to a Movement competitor.

131.     This was not an isolated event as Movement has identified similar examples where Mr. Felix is on email chains with Movement employees to finalize loans that originated and would have closed with Movement but for Summit's scheme to mislead consumers and divert this business.  In another such example on October 10, 2023, Movement loan officer Bogdan Toderut contacted Mr. Felix to finalize the illicit transfer of another loan file to close with Summit which he indicated he was directed to do by David Vese, a branch leader at Movement.  *See* Toderut

32

Email attached as Exhibit T. Both Movement employees who worked in Cumming, GA would resign their positions to accept jobs at Summit that same month with Mr. Vese receiving a title promotion to branch manager.

132. Resigning LOs worked in concert with Summit, diverted personal nonpublic information without a customer's consent to facilitate Summit's ability to seamlessly divert the loan. Once in a position to do so, the Resigning LOs thereafter completed the diversion of the loans by creating actual consumer confusion once Summit was ready to move forward with the loan.

133. This scheme was systemically instituted by Summit with knowledge that it violated multiple lending and privacy laws, created borrower confusion, placed borrowers at risk, and interfered with Movement's employment relationships with loan officers and prospective relationships with customers. Additionally, it utilized trade secrets – the identity of ready, willing, and able borrowers prepared to close a loan with Movement who were not identified to the public, as well as their personal financial data provided to Movement in confidence to systemically divert loans to Summit.

## COUNT I
**Breach of Contract Against Defendants Pennington, Shelton, Schoolfield, Covett, Plymale, and Frye**

134. Movement incorporates all previous paragraphs as if fully set forth herein.

135. Defendant Pennington and Restricted Employees Schoolfield, Shelton, Covett, and Frye (the "Restricted Employees") executed agreements with Movement that set forth certain terms regarding their employment with Movement.

136. Specifically, the Restricted Employees agreed not to, for a period of twelve months after the termination of their employment with Movement, directly or indirectly solicit any Movement employee to terminate their employment with Movement.

137. Defendant Pennington agreed not to, during his employment and for a period of six months after the termination of his employment with [Movement], solicit any [Movement] employee to terminate their employment with [Movement].

138. Additionally, Defendant Pennington and the Restricted Employees agreed not to use or disclose Movement's confidential information except for the Company's benefit.

139. Defendant Pennington and Restricted Employees breached their agreements by, *inter alia*, soliciting and/or attempting to solicit Movement employees to terminate employment with Movement and by using, disclosing, and/or stealing Movement's trade secrets and confidential and proprietary information for Summit's benefit.

140. As a proximate result of Defendant Pennington and the Restricted Employees' breach, Movement has suffered, and will contain to suffer, damages and loss.

141. Defendant Pennington and the Restricted Employees' actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

142. Defendant Pennington and the Restricted Employees' continued conduct will cause irreparable harm to Movement.

143. Section V of the Restrict Employees' agreements provide that in the event of breach or threatened breach of any provision of the agreements where Movement cannot be reasonably or adequately compensated in damages, Movement shall be entitled to injunctive relief enjoining or restraining such action.

34

144. The Restricted Employees' agreements further provide that Movement may seek injunctive relief from this Court notwithstanding the arbitration provisions contained in those Agreements.

145. Pursuant to the Restricted Employees' agreements, Movement is entitled to recover reasonable attorneys' fees and costs associated with investigating and enforcing the obligations that Movement seeks to enforce herein.

## COUNT II
### Breach of Fiduciary Duty Against Defendants Pennington, Shelton, Plymale, and Schoolfield

146. Movement incorporates all previous paragraphs as if fully set forth herein.

147. As leaders at Movement, Movement placed confidence in Defendants Pennington, Shelton, and Schoolfield to act in good faith with regards to Movement's interest.

148. Defendants Pennington, Shelton, and Schoolfield were in a position of domination and influence over Movement employees and its business and were entrusted with trade secrets and confidential and proprietary information regarding Movement's business, strategies, and employees.

149. Defendant Plymale, as a result of the role she served as Shelton's assistant in a position of trust, had extensive and unique access to Movement's trade secrets and confidential and proprietary information exceeding that of virtually all other Movement employees.

150. Given the nature of Defendants Pennington, Shelton, Schoolfield, and Plymale's relationships with Movement and access to its trade secrets, Defendants owed Movement certain fiduciary duties, including the duty of loyalty, good faith, fair dealing, to act in Movement's best interest and to avoid acting in a manner detrimental to Movement's financial, business, and other interests.

151.     Defendants Pennington, Shelton, Schoolfield, and Plymale breached their fiduciary duties to Movement by, among other things, using trade secrets and confidential and proprietary information to solicit and/or attempt to solicit Movement employees, including while Defendants were still employed at Movement and directing and facilitating the theft of the Company's trade secrets while remaining employed by the Company, as well as through sharing that sensitive material with a direct competitor of Movement.

152.     In acting in the manner described herein, Defendants Pennington, Shelton, Schoolfield, and Plymale did not exercise the care required in their positions, in that they used their positions of trust and confidence to further their own interests and the interests of Summit, and in doing so caused injury to Movement.

153.     As a result, Defendants Pennington, Shelton, Schoolfield, and Plymale have breached, and continue to breach, their fiduciary duties and duty of loyalty owed to Movement, and Movement has been and continues to be irreparably harmed by Defendants Pennington, Shelton, Schoolfield, and Plymale's actions.

154.     Defendant Schoolfield, Shelton, and Plymale's employment agreements further provide that Summit may seek injunctive relief from this Court.

### COUNT III
### Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act
### 18 U.S.C.A. § 1836 Against Defendants Shelton, Plymale, Pennington, and Summit

155.     Movement incorporates all previous paragraphs as if fully set forth herein.

156.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" –

provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

157.     Movement's confidential and proprietary information includes, among other things, training materials, lead lists and leads, nonpublic borrower financial and personal information, and pipeline reports constitute trade secrets under the DTSA.

158.     Additionally, the stolen information included reports and data about Movement employees, their productivity, performance, compensation, and recent loan origination activities, as well as private contact information, all of which would provide a competitor a significant advantage in recruiting and soliciting them to leave the Company.

159.     Movement derives independent economic value from its confidential data and trades secrets including its borrower information, customer lists, customer data, employee data, and pricing information.

160.     Movement's trade secrets are related to products or services used in interstate commerce. Defendant Pennington was entrusted with trade secret information in the performance of his job.

161.     Defendant Pennington improperly, unlawfully and maliciously (or, in the alternative, in bad faith) disclosed and/or used these trade secrets for the use and benefit of Summit.

162.     Defendant Plymale was entrusted with trade secret information in the performance of her job.

163.     Defendant Plymale improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets for the use and benefit of Summit.

164.    Summit and at least Defendant Shelton were aware of and facilitated Defendant Plymale in taking and using these trade secrets.

165.    Summit was aware of, requested, and facilitated Defendant Pennington in taking and using Movement's trade secrets.

166.    Summit further permitted the use of these trade secrets for its own benefit.

167.    Defendants Plymale, Pennington, Shelton, and Summit utilized such trade secrets without Movement's express or implied consent, all to Movement's detriment.

168.    As a direct result of Defendant Plymale, Pennington, Shelton, and Summit's Actions, Movement was harmed and continues to be harmed.

**COUNT IV**
**Misappropriation of Trade Secrets in Violation of the North Carolina Trades Secrets Protection Act Against Defendants Shelton, Plymale, and Summit**

169.    Movement incorporates all previous paragraphs as if fully set forth herein

170.    The North Carolina Trades Secrets Protection Act ("NCTSPA"), N.C. Gen. Stat. § 66-152 prohibits the misappropriation of trade secrets.

171.    The NCTSPA defines "trade secret" as information that "derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from the disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

172.    The NCTSPA defines misappropriation as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret."

38

173.    Movement's proprietary information including, among other things, training materials, lead lists and leads, nonpublic borrower financial and personal information and pipeline reports constitute trade secrets under the NCTSPA.

174.    Movement derives independent economic value from its confidential data and trades secrets including its borrower information, customer lists, and pricing information.

175.    Movement's trade secrets are related to products or services used in interstate commerce.

176.    Defendant Pennington was entrusted with trade secret information in the performance of his job.

177.    Defendant Pennington improperly, unlawfully and maliciously (or, in the alternative, in bad faith) disclosed and/or used these trade secrets for the use and benefit of Summit.

178.    Defendant Plymale was entrusted with trade secret information in the performance of her job.

179.    Defendant Plymale improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets for the use and benefit of Summit.

180.    Summit and at least Defendant Shelton were aware of and facilitated Defendant Plymale in taking and using these trade secrets.

181.    Summit was aware of, requested and facilitated Defendant Pennington in taking and using Movement's trade secrets.

182.    Summit further permitted the use of these trade secrets for its own benefit.

183.    Defendants utilized such trade secrets without Movement's express or implied consent, all to Movement's detriment.

184. As a direct result of Defendants Pennington, Plymale, Shelton and Summit's Actions, Movement was harmed and continues to be harmed. Pursuant to N.C. Gen. Stat. §66-152-154, due to Defendants Pennington, Plymale, Shelton and Summit's willful and malicious misappropriation, Movement is entitled to recover reasonable attorneys' fees.

**COUNT V**
**Tortious Interference with Contractual Relations**
**Against Defendants Summit and Pennington**

185. Movement incorporates all previous paragraphs as if fully set forth herein.

186. Movement entered into contractual agreements with Defendants Schoolfield, Shelton, Plymale, Covett, and Frye that included, among other things, certain restrictive covenants and confidentiality agreements.

187. Upon information and belief, Defendants Summit and Pennington knew that Movement had contractual agreements with Defendants Schoolfield, Shelton, Plymale, Covett, and Frye, as well as many other employees who have been solicited to join Summit that included certain restrictive covenants.

188. As alleged in detail above, Defendants Summit and Pennington were aware of and facilitated Defendants Shelton and Plymale misappropriating Movement's confidential information and trade secrets.

189. Furthermore, Defendants Summit and Pennington were aware of and facilitated Defendants Schoolfield, Shelton, Covett, and Frye, as well as additional Former Employees of Movement including Bart Evans and Chris McCabe, breaching the non-solicitation obligations set forth in their respective employment agreements.

190. Defendants Summit and Pennington conspired with Defendants Shelton, Schoolfield, Frye, Covett, and Plymale, as well as additional Former Employees of Movement

including Bart Evans and Chris McCabe, to breach their respective employment agreements, applicable restrictive covenants and applicable fiduciary duties.

191.    Moreover, Defendant Summit solicited employees of Movement to breach their employment agreements and fiduciary duties through transmitting customer information and diverting loans via misrepresentation to ensure they closed with Summit rather than Movement without regard to the customer's preferences or best interests.

192.    Defendants Summit and Pennington knew that their misconduct would cause Movement to lose employees and business.  They engaged in such misconduct with the purpose of causing this loss.

193.    As a result of Defendants Summit and Pennington's purposeful actions, Movement has suffered and continues to suffer damages in the form of monetary losses.

194.    Upon information and belief, Defendants Summit and Pennington took these actions to "gut" Movement and cause economic harm to Movement.

## COUNT VI
## Civil Conspiracy Against All Defendants

195.    Movement incorporates all previous paragraphs as if fully set forth herein.

196.    Beginning in or about March 2023, Defendants conspired to take the tortious actions described herein together against Movement.

197.    Defendants took the tortuous actions described herein, in direct violation of applicable laws, for the primary purpose of soliciting Movement employees and customers, thereby usurping the business opportunities of Movement for the benefit of Summit.

198.    As a result of Defendants' conspiracy to take tortious and unlawful action against Movement, Movement suffered and continues to suffer substantial economic impact and monetary damages.

41

199.     Defendants Schoolfield, Shelton, Covett, and Frye's employment agreements further provide that Summit may seek injunctive relief from this Court.

## COUNT VII
### Violation of the North Carolina Unfair and Deceptive Trade Practices Act Against All Defendants

200.     Movement incorporates all previous paragraphs as if fully set forth herein.

201.     The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") deems "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). The statute defines that "'commerce' includes all business activities, however denominated." N.C. Gen. Stat. § 75-1.1(b).

202.     "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict." N.C. Gen. Stat. § 75-16.

203.     Reasonable attorneys' fees may be awarded when "[t]he party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit." N.C. Gen. Stat. §75-16.1(1).

204.     Defendants undertook a coordinated effort to solicit Movement employees while various former employees were still employed at Movement, violate their restrictive agreements,

and/or engage in a deceptive manner to unfairly circumvent restrictive agreements and the Restricted Employees' obligations to Movement.

205. Defendants improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used Movement's trade secrets and confidential and proprietary information for the use and benefit of Summit.

206. This information is related to Movement's products or services, as well as customer information used in commerce.

207. Defendants Pennington, Shelton, Schoolfield, Plymale, Covett, and Frye, as well as other Movement employees who were impermissibly solicited, were entrusted with Movement's trade secrets and confidential and proprietary information in the performance of their jobs.

208. Defendants utilized such protected and closely guarded information without Movement's express or implied consent, all to Movement's detriment.

209. As a direct result of Defendants' Actions, Movement was harmed and continues to be harmed. Pursuant to N.C. Gen. Stat. §§ 75-16; 75-16.1, due to Defendants' unfair and/or deceptive acts, which caused significant negative impact to Movement's business activities. Movement is entitled to treble damages and to recover reasonable attorneys' fees.

## COUNT VIII
### Tortious Interference with Advantageous Business Relationships and Prospective Economic Advantage Against Defendant Summit

210. Movement incorporates all previous paragraphs as if fully set forth herein.

211. Plaintiff had established advantageous business relationships with its former, current, and prospective customers, of which Summit was aware.

212. Summit, through the activities of their agents described in this Amended Complaint, interfered with and are continuing to interfere with one or more of Plaintiff's business

43

relationships with its former, current, and prospective customers by soliciting, taking away, and making sales to them.

213.    The Resigning LOs instructed consumers to finalize their loan agreements with Movement's "sister company," before directing them to contact Summit representatives to secure their business for Movement's competitor.

214.    Summit created a position entitled a Portfolio Retention Manager to conceal their activities through which Defendants directed Movement's resigning employees to send customers and/or customer information to finalize loans at Summit that the consumers believed, or at least originally intended, to be closed with Movement.

215.    The Resigning LOs worked in concert with Summit and caused actual consumer confusion as to which entity they were dealing with when seeking financing for a residential mortgage loan.

216.    Summit's interference is wrongful, without privilege, malicious, intentional, without justification, and constitutes unlawful restraints on trade through their professed intentions to "gut" Movement's company.

217.    Summit has been unjustly enriched as a direct and proximate result of their wrongful acts, and Movement has suffered damages in an amount not yet fully determined as it works to identify how many customers Summit successfully diverted.

## COUNT IX
## Violation of the Lanham Act, 15 U.S.C. 1125(a) Against
## Defendant Summit

218.    Movement incorporates all previous paragraphs as if fully set forth herein.

219.    "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination

44

thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.  15 U.S.C. 1125(a)(1).

220.    In "a violation under section 1125(a) … the plaintiff shall be entitled … to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. 1117(a).  "In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  *Id.*

221.    "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty."  *Id.*  The Court "may award reasonable attorney fees to the prevailing party" as well.  *Id.*

222.    Summit engaged in a coordinated scheme to solicit large portions of Movement's business, first by targeting key employees and obtaining access to trade secrets and confidential and proprietary information, then by using that material to target additional high-earning employees of Movement's, who they then used to mislead and divert customers from closing loans at Movement to unwittingly do so at Summit.

223.     Summit's agents made material misrepresentations to numerous consumers that the consumers would be engaging in transactions with Movement, and that Movement would maintain their confidential information and originate, process, and close their transactions.

224.     Summit's agents held themselves out to the public as agents of and licensed with Movement and customers believed they were dealing with licensed loan originators of Movement.

225.     Summit's agents also misrepresented to consumers and potential consumers that they were engaging in transactions with representatives and agents of Movement, while they were actually working on behalf of Summit.

226.     Unbeknownst to Movement's customers, Summit's agents were originating, processing, underwriting, approving, pricing, and funding consumer loans with the intention of diverting them – and in fact, did divert them – to Summit, a Movement competitor.

227.     Customers provided information to Summit's agents with the intent and belief that such information would be maintained in confidence with Movement when in fact Summit's agents had every intention of sharing that information, without the consumer's knowledge or consent, with Summit.

228.     Summit's agents instructed consumers to finalize their loan agreements with Movement's "sister company," before directing them to contact Summit representatives to secure their business for Movement's competitor.

229.     Summit created a position entitled a Portfolio Retention Manager to conceal their activities through which Summit's agents directed Movement's resigning employees to send customers and/or customer information to finalize loans at Summit that the consumers believed, or at least originally intended, to be closed with Movement.

230. Summit's agents at all times worked in concert with Summit and caused actual consumer confusion as to which entity they were dealing with when seeking financing for a residential mortgage loan.

231. Summit has been unjustly enriched as a direct and proximate result of their wrongful acts, and Movement has suffered damages in an amount not yet fully determined as it works to identify how many customers Summit successfully diverted.

232. As a direct result of the Summit's actions, Movement has been harmed and continues to be irreparably harmed by the loss of business and goodwill in the marketplace and consumers harmed through Summit's and their agents' material misrepresentations.

233. The foregoing acts constitute unfair competition in violation of Section 43(a) of the Lanham Act.

234. Summit acted knowingly, willfully, and in conscious disregard of the rights of individual consumers, Movement, and the general public.

## PRAYER FOR RELIEF

**WHEREFORE**, as to all counts and Defendants, Movement respectfully requests that the Court enter a temporary restraining order, including but not limited to, the following relief which seeks only equitable relief as permitted under their employment agreements against Defendants Schoolfield, Shelton, Covett, Frye, and Plymale, as well as equitable relief and monetary damages against Defendants Pennington and Summit:

### Defendants Shelton, Schoolfield, Covett, Frye, Plymale, Pennington, and Summit:

A. Ordering Defendants to respond to Movement's First Set of Request for Production of Documents within fourteen (14) days;

47

B. Ordering Defendants Pennington, Schoolfield, Shelton, Covett, Plymale, and Frye (the "Individual Defendants") to provide for inspection, data collection, and analysis to a third-party forensic expert selected by Movement, any desktop, laptop, smartphone, tablet computer, external hard drive, Cloud Servers, or cloud based storage used by the Individual Defendants, including but not limited to iPhones, Androids, Blackberries, CD-ROMs, USB drives, and thumb drives;

C. Enjoining the Individual Defendants, and all other persons or entities acting in concert with them or on their behalf, including but not limited to Defendant Summit, from, directly or indirectly, using, disclosing, or deleting any proprietary, confidential or trade secret information of Movement;

D. Ordering the Individual Defendants to provide for inspection, data collection, and analysis to a third-party forensic expert selected by Movement, all storage accounts and all email accounts and emails therein used by the Individual Defendant in the last 12 months, as well as all information needed to access the Cloud Servers or cloud storage accounts and email accounts, including user identification and password;

E. Ordering the Individual Defendants to return to counsel for Movement any and all documents, electronic, or digital files prepare during, arising from, or containing information related to Movement, including, but not limited to, all originals and copies of such documents, and all computer diskettes, smart phones, flash drives, or other data storage media containing such information;

F. Ordering the Individual Defendants to certify that they have returned all information set forth in the above paragraphs, and that they have not retained any copies of such

48

information regardless of the form of such information (e.g., original document, hard copy of document, facsimile copy, electronic email or image);

G. Enjoining Defendants, and all other persons or entities acting in concert with Defendants, including but not limited to Defendant Summit, from, directly or indirectly, soliciting Movement employees;

H. Contractual attorneys' fees; *and*

I. Granting Movement such other and further relief as the Court may deem just, equitable, and proper.

## **Defendants Pennington and Summit**

A. Such actual and nominal damages as may be proven, in excess of $75,000.00, against Defendant Summit and Defendant Pennington, as a result of Defendants Summit and Pennington's conduct as well as those of their agents;

B. Trebling of actual damages against Defendants Summit and Pennington arising out of Movement's conspiracy claim, NCUDTPA claim, and/or Lanham Act claim;

C. Punitive damages against Defendants Summit and Pennington arising out of Defendants Summit and Pennington's civil conspiracy;

D. Pre- and post- judgment interest;

E. Costs;

F. Statutory attorneys' fees; *and*

G. Granting Movement such other and further relief as the Court may deem just, equitable, and proper.

## **Demand for Jury Trial**

Movement respectfully requests and demands a jury trial on all issues so triable.

Respectfully submitted this 19th day of December, 2023

/s/ Ari Karen
Ari Karen (Admitted PHV)
V. Amanda Witts (Admitted PHV)
Alexander Rogosa (Admitted PHV)
MITCHELL SANDLER PLLC
1120 20th Street NW, Suite 725
Washington, DC 20036
Office: (202) 886-5265
E-mail: akaren@mitchellsandler.com
       v.awitts@mitchellsandler.com
       arogosa@mitchellsandler.com

/s/ G. Bryan Adams, III
G. Bryan Adams, III (N.C. Bar No. 17307)
C. Grainger Pierce, Jr. (N.C. Bar No. 27305)
VAN HOY, REUTLINGER, ADAMS &
PIERCE, PLLC
737 East Boulevard
Charlotte, North Carolina 28203
Telephone: 704-375-6022
Fax: 704-375-6024
Email: bryan.adams@vraplaw.com
       grainger.pierce@vraplaw.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify that this day I have served a copy of the within and foregoing Plaintiff's Third Amended Complaint with the Clerk of Courts using the CM/ECF system which will automatically send e-mail notification of such filings to the attorneys of record.

Respectfully submitted this 19th day of December, 2023

/s/ Ari Karen
Ari Karen (Admitted PHV)
V. Amanda Witts (Admitted PHV)
Alexander Rogosa (Admitted PHV)
MITCHELL SANDLER PLLC
1120 20th Street NW, Suite 725
Washington, DC 20036
Office: (202) 886-5265
E-mail: akaren@mitchellsandler.com

/s/ G. Bryan Adams, III
G. Bryan Adams, III (N.C. Bar No. 17307)
C. Grainger Pierce, Jr. (N.C. Bar No. 27305)
VAN HOY, REUTLINGER, ADAMS &
PIERCE, PLLC
737 East Boulevard
Charlotte, North Carolina 28203
Telephone: 704-375-6022
Fax: 704-375-6024

# **VERIFICATION**

_Laura Bowles_ states that I serve as _CFO_ for Movement Mortgage, LLC, the Plaintiff in this matter. I have read and understand this Complaint and now the contents to be true of my own personal knowledge, except for those matters and things set forth upon information and belief, and as to those matters and things, I believe them to be true.



Sworn to and subscribed before me this 18th am day of <u>December</u>, <u>2023</u>.

_____
Notary Public

My commission expires: _March 3, 2026_.

ALICIA MALPIEDI
Notary Public, State of South Carolina
My Commission Expires 3/3/2026