| | |
|---|---|
| **MOVEMENT MORTGAGE LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **ORDER** |
| ) | |
| **SUMMIT FUNDING, INC., et al.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

**THIS MATTER** is before the Court on a renewed motion for preliminary injunction and request for a finding of contempt. (Doc. No. 28). On November 3, 2023, this Court entered a stipulated preliminary injunction in the instant action after Movement moved for emergency injunctive relief to recover confidential information and stop Summit from soliciting Movement employees in certain ways. (Doc. No. 23). That injunction provided for, among other things, a process by which Movement could retrieve any information taken by Summit or the individual defendants and prohibitions on Summit soliciting Movement employees in some circumstances. (*Id.*). Movement now moves for additional injunctive relief and for a finding of contempt, arguing that Summit violated this Court's earlier order and offering new evidence of Summit's alleged wrongdoing. Because Movement demonstrates a likelihood of success on its claims against Summit, additional injunctive relief is proper.

## I. BACKGROUND

Movement offers three new bases for preliminary relief: (1) evidence of Summit's continued solicitation of Movement employees; (2) evidence of an alleged deceptive scheme by Summit to divert Movement loan customers; and (3) evidence tying Summit to the theft and use of Movement's confidential information.

This Court's November 3 injunction prohibits Summit from soliciting Movement employees "If Defendants have already solicited that individual since June 1, 2023; and/or [i]f Defendants are directly or indirectly using any confidential or proprietary information obtained from Movement to aid or facilitate such solicitation." (Doc. No. 23). Before the Court entered that injunction, however, Summit recruited Movement employees heavily.

Two Movement employees who later moved to Summit, Bart Evans and Chris McCabe, were responsible for much of that early recruitment. According to Movement, Evans and McCabe visited Movement employees in Austin, Texas to solicit their moves to Summit. Following that visit, according to Movement, Movement employees "expressed concerns that Movement intended to reduce loan officer compensation by 75%, decrease market leader compensation and lay-off loan officer assistants." (Doc. No. 28). Summit then made offers to "an estimated twenty to twenty-five employees" in Evans' former Movement region, and on November 3, Evans resigned from Movement to join Summit. (*Id.*).

The solicitation did not stop on November 3, however. According to Michael Davis, Movement employee Chris McCabe solicited him not only in the fall of 2023

up to November 3, but also "almost every day" from November 3 to November 10, when McCabe himself resigned to join Summit.

Movement also alleges that Summit devised a scheme to steal potential customers from Movement before they closed their loans. According to Movement, Summit created a "Portfolio Retention Loan Officer" position for this purpose. In Movement's narrative, a Movement employee planning to leave Movement would gather details from a prospective client then, at the last minute, transfer the information to Summit's "Portfolio Retention Loan Officer," who would move forward with the customer at Summit. Movement provides an email chain from October 2, 2023, showing what it claims is such a transaction. In that chain, a Movement employee encourages a client to "hold[] off on locking." (Doc. No. 28-5). The employee then recommends, however, that "we go ahead and get you applied with our sister company and if rates drop, we'll lock you in there." (*Id*.). The Movement employee then forwarded the client's information to Summit.

Finally, Movement offers new evidence tying Summit to the theft and use of Movement's confidential information. Specifically, Movement provides emails, text messages, and other documents that indicate Summit's CEO, Todd Scrima, directed Linda Plymale to access, download, and steal Movement's confidential information and bring that information to Summit. Moreover, Movement offers evidence that Scrima sought other confidential information presented in Movement's Profit and Loss Statement – though he knew it was confidential – and directed his team to "dissect" and use that information in order to gain a competitive edge against

Summit. Not only did Summit claim it was uninterested in such information during earlier briefing, but this Court's November 3 order requires Summit to return it.

## II.    STANDARD OF REVIEW

Temporary restraining orders and preliminary injunctions are extraordinary remedies "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *SVB Sec. Holdings LLC v. Drendel*, No. 322CV00457RJCDCK, 2022 WL 4369991, at *3 (W.D.N.C. Sept. 21, 2022) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). The standard for granting either a TRO or a preliminary injunction is the same and is well established. *Id.* The party seeking the preliminary injunction must demonstrate all of the following: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). "An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

## III.    DISCUSSION

Based on updated allegations, Movement requests the following relief:

A.    Enjoining Summit, and all other persons or entities acting in concert with them or on its behalf, whether employed at Summit or otherwise, from directly or indirectly soliciting Movement's employees;

B.    Enjoining Summit, and all other persons or entities acting in concert with them or on its behalf, whether employed at Summit or otherwise,

from directly or indirectly soliciting, transferring and/or diverting customers applying for loans with Movement;

C.   Enjoining Summit, and all other person persons or entities acting in concert with them or on its behalf, whether employed at Summit or otherwise, from directly or indirectly taking disseminating or utilizing any confidential or proprietary information obtained from Movement;

D.   An Order finding Summit in civil contempt for violating the Stipulated Preliminary Injunction;

E.   Attorneys' fees and costs associated with brining the instant motion; and

F.   Granting Movement such other and further relief as the Court may deem just, equitable, and proper.

Injunctions must be specific. Federal Rule of Civil Procedure 65(d) provides that every injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Rule 65's provisions "are not mere technical requirements," but were "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *CPC International, Inc. v. Skippy Inc.*, 214 F.3d 456, 461 (4th Cir. 2000) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). "Basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476.

### A.   Movement Demonstrates a Likelihood of Success Sufficient to Warrant New Injunctive Relief

Movement asserts an Unfair and Deceptive Trade Practices Act claim against all defendants but focuses its updated briefing on Summit's conduct. Under North Carolina law, Movement must show (1) the defendant committed an unfair or

5

deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. *See Hester v. Hubert Vester Ford, Inc.*, 239 N.C. App. 22, 26, 767 S.E.2d 129, 134 (2015).

In the employment context, North Carolina courts have applied the UDTPA when the allegations (1) involve egregious activities outside the scope of an employee's assigned employment duties, and (2) otherwise qualified as unfair or deceptive practices that were in or affecting commerce. *See, e.g.*, *Dalton*, 353 N.C. at 656, 548 S.E.2d at 710–11. Under N.C.G.S. § 75–1.1, a jury decides whether defendants committed the alleged acts, and then court will decide, as a matter of law, "whether these proven facts constitute an unfair or deceptive trade practice." *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 187 n. 2, 437 S.E.2d 374, 377 n. 2 (1993).

In *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 620 S.E.2d 222 (2005), the North Carolina Court of Appeals affirmed a bench trial verdict (afforded the same deference as a jury verdict, *see id.* at 52, 620 S.E.2d at 225) that found the "[t]he surreptitious and intentional use of [plaintiff's] employees to solicit other key employees while both the soliciting and solicited employees were still employed by [plaintiff] is an unfair trade practice." *Id.* at 59, 620 S.E.2d at 230.

There, the defendant used confidential information to poach plaintiff's employees, severely "crippling" plaintiff "to the point [plaintiff's] opportunity and ability to compete for key employees on a level playing field was completely

eliminated." *Id.* at 60, 620 S.E.2d at 230. Through deceptive conduct,[1] the defendant recruited entire branches of plaintiff's employees, which "devastated, rather than competed with, plaintiff's existing … business." *Id.* at 61, 620 S.E.2d at 230.

While *Sunbelt* does not establish a *per se* rule on surreptitious solicitation, *see Austin Maint. & Const., Inc. v. Crowder Const. Co.*, 224 N.C. App. 401, 421, 742 S.E.2d 535, 548 (2012), Movement demonstrates a likelihood of success on its Unfair and Deceptive Trade Practices Act claims. Movement alleges two actions distinct from its earlier motion and stipulated injunction: (1) that Summit expanded its solicitation after November 3, and (2) that Summit created a "Portfolio Retention" position to transfer Movement customers to Summit. It also ties Summit – through its CEO, Todd Scrima – to other unfair and deceptive trade practices discussed in briefing and orders related to the first preliminary injunction in this action.

As to its expanded solicitation claims, Movement notes that "approximately twenty-two employees have been lured to Summit since the Stipulated Preliminary Injunction was entered by this Court," and it identifies eleven of these employees by name. (Doc. No. 38) (emphasis in original). Movement relies upon the affidavit of Brady Yeager, who alleges that Bart Evans shared confidential information with

---

[1] As summarized by the Middle District of North Carolina: "defendants were found to have told customers that plaintiff's company name had changed to that of their new venture, to have used plaintiff's lease contracts and pricing information for their own benefit, to have inserted defendants' company name on plaintiff's documents, and to have deleted plaintiff's job information and forwarded plaintiff's phones to defendant upon leaving plaintiff's employment." *Champion Pro Consulting Grp., LLC v. Impact Sports Football, LLC*, 116 F. Supp. 3d 644, 658 n.7 (M.D.N.C. 2015), *aff'd sub nom. Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 845 F.3d 104 (4th Cir. 2016) (distinguishing *Sunbelt*).

Movement employees during a trip to Texas, which led to those employees' resignations. (Doc. No. 28-3). But Yeager was not on the trip, Evans denies even visiting Texas during the relevant time period, and, in any event, Evans testified that the relevant information was not confidential. (Doc. No. 36-2). Yeager also alleges that Evans "initiated the lay-off of Elise Clemmons," the daughter of an employee who later moved to Summit, and "communicated that lay-off on behalf of Movement" to generate discontent. (Doc. No. 28-3). Yeager, for his part, denies terminating Elise Clemmons – "[s]he was still employed with Movement when I resigned," he notes. (Doc. No. 36-2). These allegations, contradicted as they are by the parties involved, are insufficient to support additional injunctive relief.

Movement's allegations directed to Chris McCabe constitutes a different story. Through the affidavit of Michael Davis, a current Movement employee, Movement presents a compelling narrative of Summit's illicit behavior. This Court's November 3 order imposed narrow guardrails on Summit's solicitation: it prohibits Summit from soliciting Movement employees only if Summit had already solicited that employee since June 1, 2023, or if Summit used Movement's confidential or proprietary information in its solicitation. (Doc. No. 23).

Chris McCabe's solicitation of Michael Davis steers outside the first of the above guardrails. (Doc. No. 23 at ¶ 8a). Davis alleges that in fall of 2023 – a few months after McCabe recruited Davis to Movement – McCabe began to suggest that "things were falling apart at Movement" and, thus, that Davis should "consider jumping ship." (Doc. No. 38-8). In October, McCabe was more straightforward – he

implied he and Evans would be moving to Summit, and he suggested that Davis join. (*Id.*). Without any injunction in place at the time, such solicitation was permissible.

What followed was not. Evans resigned from Movement on November 3, 2023, the day that this Court entered its first injunction. "From that point," Davis alleges, "Mr. McCabe began soliciting me almost every day, essentially promising me anything if I would leave Movement to join Summit." (*Id.*). McCabe did not act alone. Indeed, according to Davis, McCabe – still a Movement employee on paper – promised Davis greater pay at Summit and even indicated that Evans, now at Summit, "had already approved the financial package that Mr. McCabe was offering." (*Id.*). McCabe "continued to make overtures" to convince Davis to leave Movement "until his last day at Movement, which was November 10, 2023." (*Id.*).

Such action not only violates this Court's first injunction but also serves as a basis for Movement's success on its Unfair and Deceptive Trade Practices Act claim against Summit. Summit, through Chris McCabe, solicited Michael Davis after June 1, 2023, and after November 3, 2023. Because the "surreptitious and intentional use of [a plaintiff's] employees to solicit other key employees while both the soliciting and solicited employees were still employed by [the plaintiff]" can constitute an unfair and deceptive trade practice in North Carolina, *see Sunbelt*, 174 N.C. App. at 59, 620 S.E.2d at 230, Movement demonstrates a likelihood of success on this claim.

In response, Summit argues that Movement's requested injunction amounts to an illegal restraint of trade. *See, e.g.*, *United States v. Patel*, No. 3:21-CR-220 (VAB), 2022 WL 17404509, at *11 (D. Conn. Dec. 2, 2022) (finding a no-poach agreement, "as

alleged, operates as 'an agreement between competitors at the same level of the market structure to allocate' the labor market 'in order to minimize competition'") (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)). While a no-poach agreement between Summit and Movement to minimize competition or limit the hiring of certain employees could constitute an illegal restraint of trade, Movement seeks to prevent Summit from soliciting its employees, not to prevent Summit from hiring willing workers or to prevent those workers from moving to Summit. Such a request is appropriate here.

In its second new allegation, Movement alleges a scheme by Summit to poach Movement customers through a fake "Portfolio Retention" position. Movement provides an email chain in which a Movement employee, Tyler Henry, suggests that a loan customer apply with "our sister company," Summit, rather than Movement:

> As I mentioned, I recommend holding off on locking, however we can go ahead and get you applied with our sister company and if rates drop, we'll lock you in there. The only issue with this plan is transferring the appraisal. John Felix, with Summit Funding, will be reaching out shortly with the lin[k] to apply.

(Doc. No. 28-5). Summit is, of course, no "sister company" to Movement. Summit offers a tepid response, noting "the loan did not close with Summit." (Doc. No. 36).

"[T]he fair or unfair nature of particular conduct is to be judged by viewing it against the backdrop of actual human experience and by determining its intended and actual effects upon others." *United Lab., Inc. v. Kuykendall*, 102 N.C. App. 484, 491 (1991) (*aff'd* 335 N.C. 183, 437 S.E.2d 374 (1993). The "Portfolio Retention" officer

scheme echoes the deceptive practices at issue in *Sunbelt*, and Movement demonstrates a likelihood of success on its UDTPA claim through these allegations.

Movement's requested relief is not narrowly tailored to these allegations, however. *See CPC International, Inc. v. Skippy Inc*., 214 F.3d 456, 461 (4th Cir. 2000) ("Injunctions must be narrowly tailored and should prohibit only unlawful conduct. 'An order must be tailored as precisely as possible to the exact needs of the case.'") (quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 184 (1968)). Summit notes that it is free to solicit customers that may also be "mortgage shopping" with Movement and argues it would be unable to comply with the vague request even if entered: "How can Summit know who has applied for a loan with Movement? Summit does attempt to avoid taking loans that belong elsewhere, but if Movement does not pull credit [for a customer], … then there is no way for Summit to know whether the customer has applied for a loan with Movement." (Doc. No. 36). To address these concerns, the Court will enter a narrow injunction to prohibit Summit from knowingly diverting Movement customers, either through the "Portfolio Retention" scheme outlined in Movement's briefing or through any other practice, deceptive or otherwise.

Finally, Movement brings additional evidence tying Summit to the general stream of other unfair and deceptive trade practices alleged in its first request for injunctive relief. Specifically, Movement offers evidence that Summit directed the diversion and use of Movement's confidential information, both through Linda

Plymale's theft of information and through actions regarding Movement's profit and loss statement ("P&L").

While Movement suspected much of the activity at issue, Movement now supports its allegations with evidence.[2] For example, Movement presumed that Summit directed or encouraged Linda Plymale to access, download, and steal certain Movement information before Plymale resigned. New evidence of communication between Linda Plymale and Summit's CEO, Todd Scrima, now offers a clearer window into Summit's actions – according to Movement's evidence, Scrima contacted Plymale immediately before Plymale accessed, downloaded, and stole the information at issue and brought it to Summit.

Movement also offers evidence that Summit knowingly possessed and utilized Movement's confidential information in order to unfairly compete with Movement. In one text message now before the Court, (Doc. No. 38-3), Todd Scrima asks a Summit employee if Summit had secured Movement's P&L. "Requested it twice from Deran [Pennington], not received," he answered. "I think we need to go directly to Matt [Schoolfield]," he suggested, because he was unsure "what access [D]eran has anymore." But that employee also followed up with a stark warning to Scrima: "are

---

[2] Though Summit may later object on hearsay grounds to some of the evidence Movement presents, the Court finds that such evidence is appropriate at this stage without finding that the evidence is or is not hearsay. *See G. G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017) ("Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted.").

you sure you want movement p&ls's (their proprietary/confidential docs) on summit servers?" (*Id.*). "Not on our servers," Scrima responded. (*Id.*). "Can u maybe set up misc whatsapp account and have them texted there?" (*Id.*).

Once Summit did secure the P&L, (Doc. No. 38-9), and other information in June 2023, including every Movement employee's wage information and income information, as well as all loan information on borrowers, loan details, and margin information, Scrima directed his team to "dissect" it. (Doc. No. 38-2). Summit, meanwhile, represented to Movement and this Court in October 2023 that it was uninterested in Movement's confidential information and agreed to return any stolen data. (Doc. No. 7 ("Summit and Pennington have no interest in documents that came from Movement and wish to cooperate to return such files.")).

After entry of the initial injunction in this action, Summit's apparent impropriety was not lost on Summit's more scrupulous employees. In fact, on November 8, 2023, five days after entry of the stipulated injunction, Summit's Chief Growth Officer expressed serious misgivings about "dissect[ing]" Movement's information in an email to Scrima and other Summit employees:

> So you are aware, the attached document sent by Deran to Todd contains, and the reason for my email tonight, is because of the legal agreements agreed to by Summit in the filings and injunction agreement with MM last week, which I have determined to be not in any way accurate by our organization. I have a moral issue with our position of what appears to be, at the minimum, an omission, or most likely a willful obstruction. I'm not sure of which yet and I am bringing this to your attention now and seeking your advice. This document, which was sent to me by Todd Scrima, and at his direction "please dissect this," is actual proprietary information owned by Movement Mortgage. This is not a proforma, but actual consolidated Movement Mortgage results. It includes without limitation, every employees wage information, their

> income information, as well as all loan information on borrowers, loan
> details, margin information, basically "the whole enchilada" as we would
> say in Texas. I have had this information in my possession for months
> and I have lost countless hours of sleep over this. I cannot let another
> single day go by without getting this out in the open

(Doc. No. 38-2). Through this new evidence, Movement demonstrates a likelihood of success sufficient to warrant new injunctive relief against Summit. Summit agreed to return any confidential information, but no information has yet been returned. The parties quibble over where to lie the blame for that inaction, but in light of Summit's alleged past misconduct now supported by evidence in the record, the Court finds that an injunction to prohibit Summit from continuing to use Movement's proprietary and confidential information is necessary.

Movement demonstrates a likelihood of success on its trade secret misappropriation and tortious interference claims against Summit through the same allegations outlined above. Trade secrets are protected under federal and state law. *See* Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; North Carolina Trade Secrets Protection Act ("NCTSPA"), N.C. Gen. Stat. § 66-152 *et seq.* To prevail on a trade secret claim under the DTSA, Movement must establish "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 141 (4th Cir. 2023).

Under the DTSA, a trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, … whether tangible or intangible, and whether or how stored, compiled, or memorialized

physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Movement claims that its proprietary information, including "training materials, lead lists and leads, nonpublic borrower financial and personal information[,] and pipeline reports," (Doc. No. 5), as well as its P&L, which includes wage and income information, loan information on borrowers, loan details, and margin information, (Doc. No. 38-2), could constitute trade secrets under the DTSA. Movement is correct. Movement notes that it derives independent, actual commercial value from the information it compiles on prospective and actual customers, and through its unique loan strategies and processes. Similar information has been protected under the DTSA. *See, e.g.*, *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1042 (D.S.C. 2021) (collecting cases).

Movement also demonstrates that Summit (through Scrima and Plymale) misappropriated that information. Under the DTSA, misappropriation is the "disclosure or use of a trade secret ... without express or implied consent," where the defendant either "used improper means to acquire the knowledge of the trade secret," or "at the time of disclosure or use, knew ... the knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain the secrecy ... or limit

the use of the trade secret." 18 U.S.C. § 1839(5)(A)–(B). Movement does not specifically allege that the trade secret implicates foreign or interstate commerce, but as Movement and Summit are both national businesses, Movement is likely to succeed on that prong, too.

Movement also demonstrates a likelihood of success under North Carolina law. "To make a prima facie case of trade secret misappropriation, a plaintiff must show that a defendant: '(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.'" *GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 233, 752 S.E.2d 634, 649 (2013) (quoting N.C. Gen. Stat. § 66-155). North Carolina law defines trade secret as "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that: (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3).

In applying the NCTPSA, North Carolina courts consider "(1) The extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business

and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 278, 827 S.E.2d 458, 473 (2019) (quoting *Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997) (cleaned up). Operation and pricing data, cost history records, and customer lists can all qualify as trade secrets in North Carolina under these six factors. *See GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 233, 752 S.E.2d 634, 649 (2013); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375 (2001).

Movement also sufficiently demonstrates misappropriation under North Carlina law, as discussed above. Movement alleges that Plymale, under Scrima's direction, took trade secrets from Movement and that Summit now uses those trade secrets without Movement's consent.

For purposes of its tortious interference with contract claim, Movement shows a likelihood of success on two of its contract claims: (1) breach of the non-disclosure agreement against Plymale and (2) breach of the non-solicitation agreement against Schoolfield.[3] Movement also claims that all Defendants induced other Movement

---

[3] Individual defendants Shelton, Pymale, Frye, and Covett signed an identical (for these purposes) 2013 or 2016 version of Movement's Employment Agreement, while Schoolfield signed an updated 2018 version. Each agreement includes a non-solicitation provision. The 2013 and 2016 versions are likely overbroad and unenforceable because they restrict the employee from employing, soliciting, recruiting, contracting with, influencing, or advising any other employee "for any reason." *See Power Home Solar, LLC v. Sigora Solar, LLC*, No. 20 CVS 7165, 2021 WL 2530984, at *10 (N.C. Super. June 18, 2021) (striking non-solicit because "[t]he

employees to terminate their own at-will employment contracts. To prove tortious interference, Movement must show: (1) a valid contract between Movement and a third person which conferred upon Movement a contractual right against a third person; (2) the defendant knew of the contract; (3) the defendant intentionally induced the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to Movement. *See United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

With its new evidence, Movement shows that Summit, through Scrima, induced Plymale to breach her confidentiality agreement. Movement also shows that Summit induced Movement employees to breach their non-solicit agreements and terminate their employment contracts. Though "[g]enerally speaking, interference with contract is justified if it is motivated by a legitimate business purpose," *Embree Const. Grp., Inc. v. Rafcor, Inc*., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992), Summit's interference here was unjustified after the November 3 injunction. That interference has damaged Movement through loss of employees and customers, and without further injunctive relief, Movement will suffer further damage.

---

Employment Agreement does not limit those 'employees' that he is prohibited from soliciting."); *Nouveau Riche Corp. v. Tree*, No. CV08-1627-PHX-JAT, 2008 WL 5381513, at *9 (D. Ariz. Dec. 23, 2008) (striking non-solicit because "the prohibition on solicitation as drafted seeks to restrict Defendants from soliciting these individuals to join any club or organization—even those of a recreational or non-business nature such as a book club.").

Thus, Movement demonstrates a likelihood of success against Summit on its Unfair and Deceptive Trade Practices claim, its misappropriation of trade secrets claim, and its tortious interference claim sufficient to warrant new injunctive relief.

## B. Movement Will Suffer Irreparable Harm in the Absence of a New Injunction

Movement bears the burden of demonstrating irreparable harm in the absence of a new injunction. *See Winter*, 555 U.S. at 20. It does so through its updated claims and attendant evidence. *See Willis Towers Watson Se., Inc. v. Alliant Ins. Servs., Inc.*, No. 322CV00277FDWDCK, 2022 WL 2555108, at *23 (W.D.N.C. July 7, 2022) (Whitney, J.) ("[T]he continued solicitation of … employees will also cause immeasurable and irrevocable harm to [plaintiff], as the training, experience, and knowledge employees possess, for which [plaintiff] has provided and paid over the course of their employment, is invaluable to [plaintiff's] ability to remain viable as a business."); *see also Superior Performers, Inc. v. Meaike*, No. 1:13CV1149, 2014 WL 12603107, at *1 (M.D.N.C. Feb. 20, 2014) ("Plaintiff is likely to suffer irreparable harm in the absence of a TRO, because, Defendants' actions have likely damaged, and will continue to damage Plaintiffs relationship with their current employees and clients."); *Lake House Acad. for Girls LLC v. Jennings*, No. 11 CVS 1666, 2011 WL 4862987, at *10 (N.C. Super. Oct. 13, 2011) (finding irreparable harm and issuing injunction where an individual defendant "actively solicited [plaintiff's] employees to terminate their employment and work for [another business].").

### C. The Balance of Equities and the Public Interest Support an Injunction

To warrant new injunctive relief, Movement also carries the burden of showing that the balance of equities tips in its favor and that injunctive relief is in the public interest. *Winter*, 555 U.S. at 20. Movement incorporates its earlier arguments on both points, (Doc. No. 5), and those arguments are persuasive. Movement seeks to prevent Summit from using Movement's confidential information and to prevent Summit from illicitly recruiting Movement employees.

The balance of equities weighs in favor of injunctive relief. *See Title Trading Servs. USA, Inc. v. Kundu*, No. 3:14-CV-225-RJC-DCK, 2016 WL 608193, at *8 (W.D.N.C. Jan. 5, 2016) (Conrad, J.) ("The injunction sought by [plaintiff] would not cause hardship to [defendant], since he has no legitimate rights to the trade secrets and property taken from [plaintiff]. [Defendant] can continue to trade and work in any lawful manner with his own assets. Hence, there can be no injury to him at all—and certainly no irreparable injury—if he is simply restrained and enjoined from using [plaintiff's] assets."); *Willis Towers Watson Se.*, 2022 WL 2555108, at *25 (finding the equities tipped in favor of plaintiff seeking to enjoin solicitation).

The public interest also supports an injunction. Both the United States Congress and the North Carolina legislature have designed statutes to protect against the very actions Movement alleges here, and Summit continues to engage in unfair and deceptive behavior even in the face of an injunction from this Court. *See Title Trading Servs.*, 2016 WL 608193, at *8 ("The public has no interest in allowing perpetrators of a trade secret misappropriation to benefit or profit from those acts.");

*Forestry Sys., Inc. v. Coyner*, No. 1:11-CV-295, 2011 WL 1457707, at *2 (M.D.N.C. Apr. 15, 2011) ("Put simply, the public interest favors protection of trade secrets."); *ABT, Inc. v. Juszczyk*, No. 5:09CV119-RLV, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010) ("Public interest favors the protection of confidential business information and the enforcement of valid contracts").

### D.     Summit is Held in Civil Contempt

"To establish civil contempt, the moving party must show by clear and convincing evidence '(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.'" *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 145 (4th Cir. 2023) (quoting *Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 101 (4th Cir. 2022)). Before finding a party in contempt, a district court must also provide the alleged contemnor notice and opportunity for a hearing. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27 (1994).

The Court provided Summit such an opportunity during a hearing on December 7, 2023, and Movement establishes these prongs by clear and convincing evidence. Movement's contempt arguments are based on the November 3 injunction, which was in Movement's favor and of which Summit had actual knowledge; indeed, Summit agreed to the entry of that injunction. (Doc. No. 23). Through Summit's solicitation of Michael Davis, Movement shows by clear and convincing evidence that

Summit knowingly violated the terms of the injunction. Finally, Movement sufficiently demonstrates the harm that it has suffered from the loss of its employees and confidential information. Accordingly, the Court finds Summit in contempt of Court. While the Court has inherent authority to impose sanctions upon Summit for such contempt, *Int'l Union, United Mine Workers of Am.*, 512 U.S. at 828, the expanded injunctive relief requested by Movement and granted by the Court – including attorneys' fees associated with the instant motion – is sufficient to encourage Summit's compliance.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that the Court orders new injunctive relief as follows:

A.   Summit, and all other persons or entities acting in concert with it or on its behalf, whether employed at Summit or otherwise, are prohibited from directly or indirectly soliciting Movement's employees;

B.   Summit, and all other persons or entities acting in concert with it or on its behalf, whether employed at Summit or otherwise, are prohibited from knowingly soliciting, transferring, or diverting customers engaged in the loan application process with Movement;

C.   Summit, and all other person persons or entities acting in concert with it or on its behalf, whether employed at Summit or otherwise, are prohibited from directly or indirectly taking, disseminating, using, or utilizing any confidential or proprietary information obtained from

Movement, specifically including Movement's Profit and Loss statement at issue in this litigation;

D.    Summit shall bear Movement's attorneys' fees and costs associated with bringing the instant motion, (Doc. Nos. 28 and 38 and attendant exhibits); and

E.    The Court finds Summit in civil contempt.

Signed: January 3, 2024

Robert J. Conrad, Jr.
United States District Judge